### BROTHERHOOD OF RAILROAD TRAINMEN et al. v. NATIONAL MEDIATION BOARD et al.

No. 6665.

United States Court of Appeals for the District of Columbia.

Argued Nov. 13, 1936.

Decided Dec. 21, 1936.

Albert F. Beasley and A. Lane Cricher, both of Washington, D. C., for appellants.

Leslie C. Garnett, U. S. Atty., of Washington, D. C., and Leo F. Tierney, Sp. Asst. to Atty. Gen., for appellees.

Before MARTIN, C. J., and ROBB, VAN ORSDEL, GRONER, and STEPHENS, JJ.

GRONER, J.

By Act of June 21, 1934,[1] Congress amended the Railway Labor Act for the avowed purpose of correcting defects which had become evident as the result of eight years' experience. The Act of 1926 (44 Stat. 577) had created certain definite legal obligations enforceable by judicial proceedings for the purpose, among other things, of safeguarding the rights of employees to bargain collectively with the carrier through representatives of their own choosing without interference by the carrier. Virginian Railway Co. v. System Federation, etc., (C.C.A.) 84 F.(2d) 641, 645. The amendment provided for a Board called the National Mediation Board, to which might be referred any dispute arising among the carrier's employees as to who was the representative of such employees in making contracts and working agreements with the carrier in accordance with the requirements of the act. The Board is authorized in such a case to investigate the dispute and to certify the name of the organization authorized to represent the employees involved, and to this end to cause a secret ballot of the employees in such manner as should insure a choice without interference or coercion. And in the election the Board is authorized to establish rules to govern the election and to "designate" who shall participate. Section 2, paragraph fourth, of the act provides that the majority of any craft or class shall have the right to determine who shall be the representative of the craft or class for the purposes of the act.

In the spring of 1935 a dispute arose among the road conductor employees of the Norfolk & Western Railway Company as to who should be the representative of that craft or class. At that time the conductors were represented by the Order of Railway Conductors, and the brakemen employees by appellant, the Brotherhood of Railroad Trainmen. As the result of the dispute, the Brotherhood invoked the jurisdiction of the Board for the certification of the proper representative of the craft. The Board, having assumed jurisdiction, promulgated a ruling limiting the conductor employees eligible to vote to those "regularly assigned as Road Conductors or on Road Conductors' Extra Boards * * * as of August 22, 1935."

Out of a total of 605 employees on the conductors' roster, only 294 were listed by the Board as qualified to vote, since only that number were regularly assigned as conductors or on conductors' extra boards on that date. The remainder, as the record discloses, worked a portion of their time as part-time, extra, or emergency conductors and the balance of the time as brakemen. In the election held by the Board a large majority of the 294 regular conductors voted for representation by the Order of Railway Conductors, and a certificate to that effect from the Board to the carrier followed.

The question on this appeal is whether the decision of the Board, excluding part-time conductors from participation in the election, was a mistake of law so clearly

---

[1] 48 Stat. 1185, 45 U.S.C.A. § 151 et seq.

erroneous as to make the decision arbitrary. There are other points made, one of which we shall notice.

In the railroad business the employees have for many years been divided into crafts, and in many instances these crafts form a continuous line of employments through which an employee may progress from the lower ranking crafts to the higher. The craft of brakemen comes immediately beneath the craft of conductors, and in the case of the Norfolk & Western, as doubtless also in the case of the other railroads, the custom has been at different periods to hold examinations among the senior ranking brakemen, and such brakemen as qualify are entitled to be and are placed on the company's roster of conductor employees, are given certificates as conductors, and are eligible for service as conductors when called. They acquire seniority as conductors from the date of their certification as such, *and they also continue to acquire seniority as brakemen;* but unless and until jobs are open they continue to work as brakemen. Seniority is the test for availability to a particular job, and so the highest ranking men on the conductors' seniority list are regularly assigned as conductors. The next highest ranking conductors are first called to fill vacancies, and when extra boards are established, the names of these conductors are placed on what are called "extra boards" and are drawn therefrom. When more men than are assigned regularly as conductors and on conductors' extra boards are needed for emergency, part-time, or irregular work as conductors, they are drawn in the order of seniority from those persons on the conductors' list who are then working as brakemen. The demand for such emergency conductors fluctuates seasonally and otherwise.

The bill alleges in the case of four of the emergency conductor employees who joined the Brotherhood in bringing this suit that in the eight months preceding the election one of them was assigned to work 203 working days, of which he worked 179 days as conductor and 24 as brakeman; that another was assigned to work 246 days, of which he worked as conductor 217 days and 29 as brakeman; another was assigned 266 days, of which 243 were worked as conductor and 23 as brakeman; still another, that he was assigned 336 days, of which 156 were worked as conductor and 180 as brakeman. Each of these employees alleged he was not permitted to vote because he was not "regularly assigned as a road conductor" or on the "extra board" on August 22, 1935, and each alleged that he was in fact then a member of the craft or class of conductor employees and vitally interested in any dispute affecting that craft. The bill further alleged that all the 308 excluded conductor employees had been assigned and served the railway in the capacity of conductor "a substantial portion of their time from January 1, 1935, up to and including the date on which said election was held"; and that many of them had served a greater portion of their time in such capacity as conductors than they had in the capacity of brakemen. As to all it is charged in the bill that they are in the employ of the carrier and hold certificates as road conductors and are carried on the company's roster as conductor employees; that they are governed and controlled by the carrier as to their services under the terms of the working agreement between the company and its conductor employees; that they have earned and are continuing to earn and will in the future earn seniority rights as conductors; that they serve and are required to serve as brakemen when there are no available assignments as conductors as provided in the working agreement between the company and the conductor employees, and are entitled in the order of seniority to the first available assignment as conductors; and on this basis it is claimed that they have a present, vested, and vital interest in any dispute involving the craft or class of conductor employees of the carrier.

The Board, in reaching a decision of eligibility to vote, placed its determination upon what is said to be its settled practice of limiting those eligible to vote for representation of a class or craft to "those who have a present interest in the wages, rules and working conditions of the class whose representation is to be determined." And this brings us to a consideration of the act and the existing working agreement which is made an exhibit with the bill.

The general purpose of the Labor Act was to promote peaceful and conciliatory consideration of labor disputes and especially to secure the right of collective bargaining, through a representative chosen by a majority of the employees in a particular craft or class. It is not going too far to say that the basic and underlying purpose of the act was to insure rep-

resentation in accordance with established custom to those employees whose interests are involved. But the act leaves uncertain the precise or exact meaning of the words "class or craft," and we think obviously for the reason that it was intended by Congress to adopt the designation of class or craft as determined by the then current working agreement between the railroad and particular groups or classes of its employees. And we find justification for this conclusion in paragraph 7 of section 2, which provides that: "No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 6 of this Act." In other words, that no carrier shall change the terms of its working agreement with any class of employees, as that class is embodied in and declared to exist by the working agreement, except in accordance with the terms of the agreement or in conformity with the act. In the light of this provision—and of the general scheme of the act as a whole—we think it is obvious that how classes are to be formed and who shall compose them are matters left to the employees themselves; and so we think that by reference to the terms of the working agreement which the employees have made, is to be found at least some evidence of who are members of the craft or class covered by that agreement. The Board also recognizes that this is a criterion, for in its First Annual Report to Congress, after noting that the act does not give it authority to define the crafts or classes, it says: "So far as possible the Board has followed the past practice of the employees in grouping themselves for representation purposes and of the carriers in making agreements with such representatives." [2]

An examination of the working agreement in the present case reveals that the term "conductor" as a class includes not only regularly assigned and extra board conductors but emergency conductors as well. For example:

Article 26, 1(a): "Conductors will be considered in line of promotion in accordance with seniority, ability, and fitness."

Article 26, 1(c): "The rights of conductors will commence on the day they pass the required examinations. * * *"

Article 26, 1(f): "Conductors may not voluntarily relinquish their rights as conductors and assert seniority as brakemen without losing their rights as conductors thereby."

Article 26, 1(l): "Seniority lists of conductors in road service will be posted semi-annually, in January and July of each year."

Article 26, 3: "On divisions or seniority districts where there is maintained an extra list of conductors, no emergency conductors will be used, except in case of extreme emergency where no extra conductor can be obtained."

Article 26, 2(a): "When increasing the extra conductor lists at Crewe, Roanoke, Bluefield, Portsmouth, and Joyce Avenue, the oldest emergency conductor, or conductors on the seniority district will be assigned * * *

"At terminals where extra conductor lists are not maintained, permanently vacant or newly put on pool runs will be filled by assigning thereto the oldest emergency conductor or conductors on the seniority district. * * *"

And by a supplementary agreement, effective November 1, 1932, the purpose of which was to relieve unemployment, the monthly mileage limitation agreement was amended to provide that: "1(c). The maximum monthly mileage limitation applying to men who work part time as conductor and part time as trainman in the same calendar month shall be 3500 miles, or its equivalent. * * *"

These references to the subsisting agreement between the craft and the carrier show, we think, that the excluded emergency conductors are in fact included under that agreement and that when they work as conductors they are controlled by its terms. In that agreement they have a present interest—varying in degree according to the amount of work done under it. As to some of them, as the bill shows, their wages and terms of service for the greater part of their time were controlled and regulated by the agreement. In this view it seems clear that, applying the Board's own test to the facts of the case, these individual appellants show a present interest of a substantial nature. But as we shall later point out, there is nothing in the agreement itself which shows definitely who participated in electing the represen-

---

[2] First Annual Rep. p. 20.

tative to act for the conductors in its making, that is to say, whether all or only a part were then considered eligible to vote.

The Board, as we have seen, confined the right to participation to those conductors regularly assigned or on the *extra boards* on August 22, 1935. But no reason is given for making a distinction between conductors on the extra boards and emergency conductors; but, as opposed to that distinction, we find in the agreement that extra boards are not maintained in all lines of service on all seniority districts, and that when no such boards are maintained the senior emergency conductors on the district are assigned to fill vacancies. In the absence of anything to the contrary, upon which a proper distinction can be based, it is a fair conclusion that emergency conductors, when there are no extra boards, have the same "present interest" as those conductors on the extra boards when such boards are maintained. But because it is impossible to determine this question without a fuller disclosure of the facts, we express no opinion on the question and suggest it only as showing the necessity for a fuller hearing than was had.

In addition to this, it is charged in the bill that the Board declined and refused to inform appellants of the facts upon which the Board based or made its designation or rule as to who were eligible to participate in the election on the ground that this information was obtained through its examiner and should not be divulged. This, in our opinion, was wrong, for, as was said by Mr. Justice Brandeis in United States v. Abilene & S. R. Co., 265 U.S. 274, 288, 44 S.Ct. 565, 68 L.Ed. 1016, "Nothing can be treated as evidence which is not introduced as such."

We perfectly recognize that the intent of Congress was to clothe the Board with large discretionary powers in the conduct of elections for the appointment of representatives between the carrier and the craft, and we have no desire to impinge upon or curtail this very proper discretion. The subject is an involved one, and this fact is recognized by the Board and pointed out in plain language in its report to Congress to which we have referred. But this fact all the more shows the necessity of full hearings whenever a dispute arises. And obviously the lack of such a hearing in the present case has left us, as it must have left the Board, without the necessary data on which to form an opinion. In this circumstance, if the matter of interest alone is to be adopted as the test, we should hesitate to hold that an emergency conductor whose service time on the railroad is spent 50 per cent. as conductor and 50 per cent. as brakeman should not be classified, for the purposes of agreement making, as a conductor. But, as we have seen, the intent of Congress, in leaving undefined by the act the personnel of the class authorized to choose a representative, was to adopt and confirm the grouping as it then was recognized and established by mutual agreement of employee and carrier. And this introduces another element as to which the record is wholly silent. We do not know if, in the character of grouping we have mentioned, emergency conductors were voting members of the conductor group as of the time of the passage of the act or whether at that time they were regarded by the men themselves for agreement making as members only of the brakemen group, and nothing in the so-called hearing afforded by the Board throws any light upon the subject. From all of this it is obvious that the Board acted in this dispute without affording appellants any real hearing, and this, it is needless to say, was the sort of arbitrary action which no court—when its jurisdiction is invoked —can approve.

In this situation, our conclusion is that the case should go back to the District Court with directions to set aside its former order and remand the case to the Board with instructions to annul its certification and to afford the contesting employees and Brotherhood a full hearing and then to reach a decision based only on evidence adduced at the hearing and supplemented by a finding of facts on which it rests its conclusion. When this has been done it may appear that the result of the election would have been the same, so that no new election will be required; but in any event the courts, if then called upon to review the matter, will have before them a record on which to determine whether the decision is arbitrary or capricious. Enough appears here to justify us in finding, for the reasons stated above, that the present decision—especially if made, as alleged, as the result of information only in the possession of the Board and withheld from appellants—is without legal effect and should be corrected in the way we have indicated.

Reversed and remanded.