**BROTHERHOOD OF RAILWAY & STEAM-SHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES et al v. VIRGINIAN RY. CO. et al.**

No. 4864.

Circuit Court of Appeals, Fourth Circuit.

Feb. 9, 1942.

SOPER, Circuit Judge, dissenting.

Willard H. McEwen, of Toledo, Ohio (Moses Ehrenworth, of Norfolk, Va., and Frank L. Mulholland, Clarence M. Mulholland, and Mulholland, Robie & McEwen, all of Toledo, Ohio, on the brief), for appellants.

Tazewell Taylor, of Norfolk, Va., (W. C. Plunkett, of Norfolk, Va., on the brief), for appellee Virginian Ry. Co.

J. L. Broudy, of Norfolk, Va. (M. R. Broudy, of Norfolk, Va., on the brief), for intervenors-appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

On April 29, 1939, the National Mediation Board, acting under the authority of the National Railway Labor Act, 45 U.S. C.A. § 151 et seq., certified that the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, hereafter referred to as the Brotherhood, had been "duly designated and authorized to represent both the clerical and office employees and the freight handlers, station and storehouse employees" of the Virginian Railway Company for the

purpose of collective bargaining under the provisions of the act. The Company refused to recognize or bargain with the Brotherhood as the representative of these employees, but recognized and bargained with the "Committee Representing Clerical Employees of the Virginian Railway Company", hereafter referred to as the Committee, or with its successor, the Virginian Clerks Association, hereafter referred to as the Association, as the bargaining representative of its clerical employees. This suit was instituted by the Brotherhood to enjoin the Company from interfering with its clerical, office, station and storehouse employees in the exercise of the right of collective bargaining guaranteed them by the act, and for a mandatory injunction requiring it to recognize and treat with the Brotherhood as the exclusive representative of these employees under the certification of the Board.

The Company filed answer denying interference with the right of collective bargaining on the part of the employees involved and denying that the Brotherhood was the authorized representative of these employees. It averred that the certification by the Board was void because made on representation cards alleged to have been fraudulently obtained by representatives of the Brotherhood, and not as the result of an election, and because it involved an unauthorized classification of freight handlers and station and storehouse employees, hereafter referred to as miscellaneous employees, with the clerical and office employees. The Committee and the Association intervened and answered to substantially the same effect. The judge below heard evidence and filed a memorandum in which he held: (1) that the action of the Board in combining the two groups of employees into a single class was invalid; (2) that the certification upon the authorization cards was invalid; and (3) that the Company had been guilty of acts of interference with respect to the right of self-organization for collective bargaining on the part of the employees involved. No injunction of any sort was granted, but an order was entered setting aside the certification of the Board and dismissing the suit, without prejudice, however, to the right of any party to make further application to the Board, and without limiting the power of the Board to certify the Brotherhood as the representative of the miscellaneous employees, if application to that effect should be made.

The first matter considered by the judge below in his memorandum, i. e. the question of the power of the Board to combine the clerical and office employees with the miscellaneous employees in one class for the purpose of collective bargaining, is one which can be shortly disposed of. The record shows that these employees are so combined on most roads and there would seem to be sound reason for so combining them here; but as a matter of fact they were not so combined here. On the contrary, the certificate of the Board shows unequivocally that the authorization cards presented by the Brotherhood were separately checked as to each of the classes of employees involved against the total number of employees in that class. It shows that, out of a total of 218 clerical and office employees eligible to choose a representative, 117 had authorized representation by the Brotherhood and that, out of 79 miscellaneous employees, 65 had authorized such representation. The final paragraph of the certificate is as follows: "On the basis of the investigation and check of authorizations the National Mediation Board hereby certifies that the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees has been duly designated and authorized to represent *both* the clerical and office employees *and* the freight handlers, station and storehouse employees of the Virginian Railway Company for the purposes of the Railway Labor Act." (Italics supplied.)

The fact that the same representative is certified as having been chosen by two groups of employees does not mean that the employees constituting the two groups are placed thereby in the same group or class; for it is perfectly proper for the same person or organization to represent as many different groups as may choose him, so long as their interests do not conflict. There is no reason why a group of employees may not select a union to represent them for purposes of collective bargaining, whether they are members of the union or not; and there is likewise no reason why members of distinct groups may not designate the same union as bargaining agent and still retain their separate identity. This was precisely what was done, and what was approved by us, in the former Virginian Railway case, Virginian R. Co. v. System Federation No. 40, 4 Cir., 84 F.2d 641, 642, where we said: "At this election, System Federation No. 40 of the American Federation of Labor was the

choice of the majority of those eligible to vote in four crafts, viz., the sheet metal workers, the machinists, the electrical workers and the boilermakers." The fact that members of the different groups may join the same union does not, of course, preclude the choice of that union as bargaining agent for their respective groups.

On the second question dealt with by the District Judge, the certification on authorization cards, it appears that these cards clearly and unequivocally authorized representation by the Brotherhood. They were in the following form:

"Representation Authorization.

As provided in the Railway Labor Act, approved May 20, 1926, amended June 21, 1934, I hereby designate the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees as my representative in all matters relating to employment, rates of pay, working conditions, etc., which are now or may hereafter be under consideration between my craft or class of employees and the carrier by which I am employed.

The full power and authority to act for the undersigned as described herein supersedes any power or authority heretofore given to any person or persons, labor union or organization, to act for me.

_____
Company by Which Employed

_____
Signature of Employe

_____
· Location and Title of Position

_____
Date of Signature

_____
Address at Which U. S. Mail Is Received By Employe".

There was evidence that signatures to these authorization cards were obtained by representatives of the Brotherhood; that they were filed with the mediator representing the Board, together with affidavits of the solicitors of the Brotherhood to the effect that they were duly signed by the persons whose signatures they purported to bear; and that the signatures were checked by the mediator against signatures of the employees on social security cards on file with the Company. There were 218 clerical and office employees of the Company, according to a list on which all parties agreed; and the Brotherhood presented authorization cards from 117 of these, excluding 8 cards bearing names which did not appear on the record cards. There were 79 miscellaneous employees shown by the affidavits of those who obtained the cards; but the Company claimed 96. Which of these figures is correct is immaterial, as authorization cards from 65 were presented. The members of the Committee recommended that the Board conduct an election; but the mediator told them that he did not know what method the Board would follow in discharging its duty. The Board made the certification on the basis of the majority favoring the Brotherhood as bargaining agent, shown by the authorization cards for each of the two groups.

The amendment of June 21, 1934, to the Railway Labor Act, Sec. 2 ninth, 48 Stat. 1188, 45 U.S.C.A. § 152 ninth, provides that, in case of dispute among a carrier's employees as to who are the representatives of the employees for the purposes of collective bargaining contemplated by the act, the Board shall investigate the dispute and certify the names of the "individuals or organizations that have been designated and authorized to represent the employees." That section further provides: "In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier."

The evidence before the Court shows that the practice of certifying representatives on the basis of authorization cards signed by the employees has been followed in a large number of cases. There were 20 such certifications for the year ending June 30, 1936, and 20, 18, 12 and 15 for each of the next four years respectively. The records of the National Labor Relations Board show that the same method of determining the choice of bargaining representative has been followed by it in many cases; and the action of that board in certifying on this basis, and without an election, has been approved in a number of decisions by Circuit Courts of Appeals. See N. L. R. B. v. Louisville Refining Co., 6 Cir., 102 F.2d 678, 680, certiorari denied 308 U.S. 568, 60 S.Ct. 81, 84 L.Ed. 477; N. L. R. B. v. Piqua Munising W. Products Co., 6 Cir., 109 F.2d 552, 554, 555; Art Metals Const. Co. v. N. L. R. B., 2 Cir., 110 F.2d 148, 149; N. L. R. B. v. Somerset Shoe Co., 1

Cir., 111 F.2d 681, 687; N. L. R. B. v. Dahlstrom M. Door Co., 2 Cir., 112 F.2d 756, 757. In at least one case in this Court, the designation of the bargaining agent has been made by the Labor Board, without an election, on the basis of authorization certificates signed by employees. N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 110 F. 2d 632. In one case in which a Circuit Court of Appeals refused to recognize and enforce a certification of the N. L. R. B. based on signed applications on the ground that it was not based on substantial evidence, the Supreme Court reversed. See N. L. R. B. v. Bradford D. Ass'n, 310 U.S. 318, 339, 60 S.Ct. 918, 84 L.Ed. 1226; reversing 1 Cir., 106 F.2d 119, 123.

 Whether a secret election rather than a checking of authorization cards against company records is a more desirable method of determining the bargaining representative of employees in any particular case, is a matter which the law has confided to the discretion of the Mediation Board and not to the courts. Cf. Gray v. Powell, 62 S.Ct. 326, 86 L.Ed. ——, decided December 15, 1941. As was well said by the Circuit Court of Appeals of the Fifth Circuit, speaking through Judge Foster, in Brotherhood of Locomotive Firemen, etc., v. Kenan, 5 Cir., 87 F.2d 651, 654: "There is no doubt that in establishing the Mediation Board and giving it authority as above shown Congress intended that the decisions of the Board should be final and binding upon contending groups of employees and the carrier. The validity of the section is not challenged in this case nor could it be. The general rule is that, where Congress has appointed an administrative Board and it has acted within the scope of its authority, its findings are not subject to review by the courts, if supported by evidence, there was no irregularity in the proceedings, and the constitutional rights of persons adversely affected are not violated. Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289, and authorities therein cited."

 Just as in the case of the National Labor Relations Board, there is no provision for review by the courts of a certification of a bargaining representative by the Mediation Board. Consequently, the decisions of the Supreme Court to the effect that the courts may not interfere with the Labor Board in the exercise of its discretion with respect to the selection and certification of bargaining representatives are pertinent here. A. F. of L. v. N. L. R. B., 308 U.S. 401, 406, 60 S.Ct. 300, 84 L.Ed. 347; N. L. R. B. v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; N. L. R. B. v. Waterman S. S. Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 704. In the case last cited, it was said: "The control of the election proceeding, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone. Interference in those matters constituted error on the part of the court below."

It is contended that the authorization cards were obtained by false representations made to the employees to the effect that they were to be used for the purpose of having an election held. It is to be noted, however, that these cards were signed, not by illiterate laborers, but by clerical employees, who could hardly have been mistaken as to their meaning. Only fourteen witnesses were produced who testified to such representations; and, of these, only nine had signed cards. After hearing them, the trial judge was not impressed that any fraud had been practiced. He said: "Approximately two years had elapsed between the time the signatures were solicited and the trial of the case. There had been much agitation by leaders of the Association, particularly in the early part of 1940, and it is not improbable that these more recent activities in endeavoring to defeat the Brotherhood, and indirect pressure, helped to brighten the memories of some of these witnesses. The fact that after a long lapse of nearly two years and in spite of all the agitation that had taken place, the intervenors could secure only nine (9) out of the one hundred and seventeen (117) who had signed authorization cards, willing to challenge the circumstances under which they signed, is not without significance. The court concludes that systematic misrepresentations were not made by the Brotherhood representatives and that, in general, they endeavored in good faith to avoid such practice. It is probable, however, due to the length and intensity of the campaign conducted and notwithstanding the clear language of the cards, that some of the clerks were led thereby to believe that there was to be a secret ballot taken and not a certification based on the cards alone."

 There is nothing in this finding which would justify the court in disregarding the certification of the Board, what-

ever rule be applied as to the effect of fraudulent representations in obtaining authorization cards on a certificate by it. The Board had before it cards signed by a majority of the clerical employees, it satisfied itself as to the genuineness of these cards by affidavits and by the checking of signatures, and there is no evidence that it had reason to believe that the validity of any of the authorizations was challenged. In the absence of some abuse of discretion on its part, which does not appear, its determination as to the choice of representative is binding upon us, just as would be its determination with respect to questions arising in the holding of an election. There are, of course, opportunities for fraud in the use of cards, just as there are in the holding of elections; but it is for the Board to decide the genuineness of the choice in either case, and its decision is binding upon the courts in the absence of proof that it abused its discretion or acted without substantial evidence.

■ Complaint is made that the authorization cards were not shown to the representatives of the Committee and that the list of clerical employees was made up without disclosing to the Committee that the Board would make its certificate on the authorization cards filed with it. The Committee, which the court below found to be a company dominated organization, had no legal standing in the controversy (see N. L. R. B. v. Falk Corporation, 308 U.S. 453, 459, 60 S.Ct. 307, 84 L.Ed. 396); and certainly the Board should no more have given publicity to the names of those who had given authorization cards to the Brotherhood, and thus have subjected them to the danger of reprisal or discrimination, than it should have disclosed the votes of those participating in an employees' election. The statute expressly requires that the Board shall determine the choice of representative in such manner as shall insure their choice "without interference, influence, or coercion exercised by the carrier". There is no requirement of the statute that notice shall be given when certification is to be made on authorization cards; and there is nothing to show that the Board acted arbitrarily or in bad faith in not giving such notice. While we think that a secret election is the preferable method for determining representation controversies, this is a matter which the law confides to the Board and not to us; and we cannot say that the method which the Board adopted was so arbitrary or unreasonable as to render its certification void.

■ And we are not impressed with the argument, which seems to have been accepted by the court below, that the certification of the Board should be ignored because "a substantial number of the clerks thought a secret ballot would be taken and did not anticipate that the Board's certification would be based upon authorization cards only". That they were not deceived by the mediator as to this, is shown by his testimony which was accepted by the court as the basis of the following finding, viz.: "At the conference above referred to, mediator Foran informed those present that the list of clerks eligible to vote would be used as a voting list in the event the Board decided to hold a secret ballot; that he, as mediator, was merely conducting the investigation and did not know how the Board would proceed to decide the dispute, whether by secret ballot or otherwise, and that he had no authority to say what method would be employed for that purpose by the Board." It was for the Board and not the clerks to decide how it would perform its duty; and, on no theory which we can imagine, could the fact that some of the clerks may have thought that an election would be held invalidate the Board's certification made on another basis within the limits of its authority.

■ On the third question considered by the judge below, we think there can be no doubt but that his findings with respect to the interference by the Company with the right of self organization on the part of the employees here involved was amply supported by the testimony. Not only was there proof of the specific instances of interference and domination referred to in his memorandum, which we think were correctly evaluated by him, but there was also evidence which presents, as to the Committee and its successor Association, the typical picture of a company dominated union. The Committee was well described in the District Judge's memorandum as follows:

"That organization, referred to herein as the Committee, existed, in form at least, for many years prior to the dispute which resulted in this litigation. The Committee consisted of eight (8) members, seven (7) of whom were employed at Norfolk, and one (1) at Roanoke. The committeeman residing at Roanoke was to represent the clerks of the Railway in Roanoke and to

'the west thereof. Each of the seven (7) committeemen residing in Norfolk was to represent a different department of the Railway in which clerks were employed.

"The Committee had no definite membership and no constitution or by-laws. Dues were not assessed or collected from the members. Meetings were held infrequently and apparently no records were kept of the business transacted at the meetings. When elections were to be held, cards were passed out among the clerks in the different departments. The clerks in a particular department designated one of their number in that department to represent them on the Committee. The eight (8) committeemen selected from their number a general chairman. The members of the Committee did not serve for any definite terms but held on until death or retirement from service.

"According to uncontradicted testimony of Mr. Eller, general chairman of the Committee and the most active intervenor opposing the Brotherhood, elections were conducted in the following manner: Ballots were distributed among the clerks and each clerk wrote on the ballot the name of the person for whom he voted and then signed his own name on the ballot. The ballots were then collected by Mr. Eller and delivered by him to the assistant to the president of the Railway. Thus the executives of the Railway knew, or were in a position at all times to know, how every clerk had voted.

"The Committee was never active, and, as an organization, had no real independent existence, separate and apart from the control of the Railway. The so-called negotiations between the Committee and the Railway that did occur, did not result in independent action by the clerks. On the other hand, Mr. Eller was very active on behalf of the Railway and against the Brotherhood in the campaign in question. On October 24, 1938, soon after the Brotherhood campaign began, he wrote a letter to the member of the Committee residing in Roanoke, in which, among other things, he said (Transcript p. 202): 'I am asking you to treat this confidentially, as it would not be wise to have it come out that I am helping the company fight the unions, as they would try all sorts of things to offset anything that I might do. If you feel the same as I do, that is, to stick with the company union, I would appreciate anything that you might do to let the boys out there know some of the good points stated above.'

"After the certification by the Board the Committee disbanded. The Virginian Clerks' Association was formed in the early part of 1940, and the circumstances of its organization and its activities, indicate that it was merely an attempt to revive under another name the 'Committee representing the Clerical Employees of the Virginian Railway' for the same purposes. Such organizations are contrary to the Act of Congress."

Since there is no basis for finding that the Board's certification of the Brotherhood as bargaining representative is void, and since the evidence sustains the finding of the court below that there has been interference by the Company with the exercise of the right of collective bargaining on the part of its employees, plaintiff was clearly entitled both to the mandatory and prohibitory injunctions prayed. Virginian Ry. Co. v. System Federation No. 40 et al., 300 U.S. 515, 57 S.Ct. 592, 81 L. Ed. 789, affirming, 4 Cir., 84 F.2d 641. It is contended that mandatory injunction should not be granted requiring the Company to treat with the Brotherhood as representative of the clerical employees because, following the certification by the Board, a majority of the clerical employees signed authorization cards designating the Company union as bargaining representative, and because so much time has elapsed since the certification. It is clear, however, that we must deal with the question of right of representation on the basis of the certification by the Board and "leave any question of representation which may have arisen out of changed conditions" since the certification was made to be dealt with by the Board under the provisions of the Act. N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 640; International Ass'n, etc., v. N. L. R. B., 311 U. S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; Oughton v. N. L. R. B., 3 Cir., 118 F.2d 486, 497.

It follows that the order appealed from will be reversed and the cause will be remanded for further proceedings in accordance with this opinion.

Reversed.

SOPER, Circuit Judge (dissenting).

The National Mediation Board has no power to designate the representatives of employees of a carrier for purposes of collective bargaining. That power resides with the employees who have the right to organize and bargain collectively through

representatives of their own choosing. It is only when a dispute arises among the employees as to who are their designated representatives that the Board has any authority in the premises. Then it becomes the duty of the Board "upon request of either party to the dispute" to investigate and to certify to both parties and to the carrier the names of the individuals or organizations that have been designated by the employees. 45 U.S.C.A. § 152 (4)(9).

Obviously, the investigation which the Board undertakes when it performs this duty partakes of the nature of a judicial inquiry. There are always at least two parties to the dispute, and the Board must give each of them full opportunity to present its claim and must decide impartially between them; otherwise one party or the other will be denied not only its right to free choice, but also its constitutional right to a fair trial under the due process clause of the Fifth Amendment. When something of this kind occurs, the courts not only have the power but the duty, upon proper application, to interfere. Their function is well put in the following passage from the brief filed on behalf of the Brotherhood in the instant case:

"The courts do not seek to retry every issue which has been decided by an administrative agency. Such a course would present an impossible burden and would nullify the whole theory upon which the administrative process is based, as well as the benefits sought to be gained by its establishment. They do not seek to overturn administrative rulings simply because they do not agree with them. They do, however, examine the decisions and proceedings of administrative tribunals to determine whether fundamental constitutional rights have been violated, whether the tribunal has erred in its interpretation or application of existing laws, or whether its rulings are based upon actual and credible evidence. Otherwise stated, a court may set aside an administrative finding or other only when it finds that constitutional rights have been invaded, where the finding involves an error of law, is arbitrary, unreasonable, fraudulent or unsupported by substantial evidence. In this manner the courts have succeeded in protecting the fundamental rights of which they are the custodians without shackling the administrative process."

It needs but little examination of the facts in the pending case to disclose that one of the parties to the dispute did not get a fair opportunity to present its claims under the procedure adopted by the Board. A committee of eight persons, each chosen by the clerks of a particular department in the carrier's service, had represented the clerical employees since 1921 when the United States Railroad Administration came to an end. On July 1, 1921, a contract between the carrier and the committee was signed; and thereafter, the parties seem to have dealt satisfactorily with one another, although the committee was lacking in some of the features customarily found in a labor organization, such as a constitution or by-laws, regular times of meetings, minutes of the meetings and membership dues or assessments.

In the fall of 1938, the Brotherhood of Railway Clerks sent experienced organizers to Norfolk and began the solicitation of members. During the subsequent period of five months they secured the signatures of 117 out of 218 clerks, and 65 out of 79 miscellaneous employees to authorization cards wherein the signer designated the Brotherhood as his representative in all matters relating to conditions of employment between his craft or class of employees and the carrier. Thereupon the Brotherhood requested the Board to investigate and the Board sent a mediator to Norfolk to ascertain the facts. The mediator was a former railroad yardmaster and a former member of the Brotherhood of Railroad Trainmen. According to his testimony, he spent two weeks in the field, recognized the Committee as one of the disputants and the Brotherhood as the other, conferred with representatives of each, separately and also in joint session, got them to agree upon a list of eligible voters, received the signed authorization cards for the Brotherhood together with affidavits from 9 persons who had procured the signatures, compared the signatures on the cards with the signatures of employees on the company's records, and returned to Washington. He submitted the cards and affidavits with his report. He also submitted certain information that he had obtained from 7 out of 8 members of the Clerk's Committee, which consisted of general statements or opinions as to how the clerks in each department stood on the question of representation. Since these statements did not show the number of clerks in each department, or the number for or against the Brotherhood, they threw little light on the point of inquiry. Upon this investigation and report the Board cer-

tified that the Brotherhood had been duly designated to represent both the clerks and the miscellaneous employees.

The mediator's report gave the Board little reason to distinguish the case from many other disputes that it has decided, usually by a secret ballot, less frequently by an examination of authorization cards. During the six years from 1935 to 1940 inclusive, it decided 403 disputes by election and 118 by authorization cards. But there was much more under the surface of the mediator's report which, if known to the Board, would have clearly shown the defects in its procedure. The members of the committee had no inkling that the dispute was to be settled by the presentation of authorization cards. The mediator concealed the fact that he had been given the cards gathered by the Brotherhood. Not only did he not divulge the names and numbers of the signers or the dates of the cards strung over a period of five months, but he failed to disclose that he was in possession of this information and intended to submit it to the Board as a possible basis for its determination. Nor did he suggest to the Committee that they were free to secure signed cards for their side if they so desired. As a result, the members of the Committee came to the conclusion that the contest was to be decided by secret ballot under the supervision of the Board. While the mediator told them that it was the Board's prerogative, and not his, to determine how the dispute should be decided, they told him that they regarded a secret ballot as the fairest method of decision and he induced both parties to the dispute to sign an agreement certifying a list of "eligible voters". Moreover, according to the undisputed testimony in the District Court, a considerable number of the signers of the Brotherhood cards were told by the solicitors that the cards were being taken for the purpose of obtaining a secret ballot. Fourteen witnesses testified to this effect and nine of them signed the cards. If these nine authorizations are deducted from the sum total favoring the Brotherhood, its majority disappears. A consideration of all of these facts led the District Judge to the conclusion that while the solicitors of the Brotherhood were not guilty of systematic misrepresentation, nevertheless some of the clerks were led to believe that a secret ballot was to be taken. The District Judge also found that those opposing the Brotherhood were never informed that it intended to rely upon signed authorizations instead of a secret ballot.

There was further evidence in support of these conclusions. During the whole period of the Brotherhood's activity the Committee did not solicit a single signature; and clearly it would not have been so inactive had it understood or suspected the use to which the signed cards were to be put. That it could easily have secured a majority of the clerks in its favor is demonstrated by the subsequent event. As soon as the Committee received the Board's certificate of April 29, 1939, and learned, greatly to its surprise, that the Board had decided the dispute upon the authorizations submitted by the Brotherhood, the chairman of the Committee was able in a few days to secure 158 signatures out of a possible total of 218, or 72.5 per cent of the number of clerks on the eligible lists. And on May 13, 1939, he communicated this fact to the Board in a letter in which he referred to the long period during which the Brotherhood cards were gathered and told the Board of the misunderstandings under which the Committee labored during the contest and he requested the holding of an election by secret ballot. But the Board refused the request and announced its unwillingness to consider the facts upon which the request was based. The practical result was that the decision went against the Committee before it fully realized that the contest had begun.

What answer is made in defense of the palpable injustice of this procedure? It is pointed out that under the statute the Board has authority in its discretion to take a secret ballot or to utilize any other appropriate method to ascertain the names of the chosen representatives in such a manner as will ensure a choice, free from the influence of the carrier; and also that the practice of certification on the basis of authorization cards has been followed in many cases. It is also said that as the cards on their face conferred complete authority upon the Brotherhood, and as the Board had no reason to believe that their validity was challenged, the court below was not justified in refusing recognition of the Board's certificate; and finally it is said in effect that as the Committee was a company dominated organization, it had no legal standing in the controversy and no right to be told the names of the persons who had signed the Brotherhood cards,

or even the method by which the contest was to be conducted.

This line of reasoning misses the essential point in the case that in dealing with a representation dispute, the National Mediation Board acts as a judicial body, charged with the duty to decide impartially between opposing parties. While it has discretion in respect to its procedure, it may not adopt any method of determination that discriminates between the parties or denies to either a fair opportunity to present its claims. No method is appropriate within the meaning of the statute unless it conforms to the constitutional requirement of due process. It does not suffice to say in this case that the Board had no reason to suspect the invalidity of the cards. The agent of the Board made no independent investigation other than to check the handwriting of the signers, and he concealed his acceptance of the cards from the only party to the controversy that was likely to challenge their validity. The course pursued by the mediator may be adequate in most cases; but when its defects were promptly exposed in this exceptional case, the Board was not justified in ignoring them on the ground that it was not informed until after it had issued its certificate. Discovery in this case was delayed by the conduct of the mediator; it was made to the Board by the Committee in the most convincing fashion at the earliest opportunity; and the Board's refusal even to consider the evidence was an indefensible denial of justice. It is outside the function of the court to minimize this evidence; it was substantial; it was sufficient to convince an impartial and experienced trial judge; and the duty rests upon the Board after due consideration to determine its weight and credibility.

Least persuasive of all is the argument that the Committee was not entitled to fair treatment because it was dominated by the carrier and therefore had no legal standing in the controversy. There was evidence to support the charge and the finding of the District Judge in this respect; and it may be assumed that if the evidence were submitted to the Board it would reach the same conclusion. But this issue was not raised during the controversy and the Board's certificate was not based upon it. On the contrary, the mediator formally recognized the Committee as one of the contestants and led the employees to believe that it was authorized to represent them;

and if the controversy is now to be decided on the theory that the Committee was an illegal body, then it is obvious that the clerks who adhered to the Committee have been misled by the agent of the Board and that a new opportunity to exercise their free choice must be afforded them. It should be borne in mind that designation of the Brotherhood does not result from disqualification of the Committee.

The certification of the Board should be denied recognition for the additional reason that contrary to the statute, the Board placed the clerks and the miscellaneous employees in the same class. The power of the Board to classify employees at will has been denied in two carefully considered cases: Brotherhood of Railroad Trainmen v. National Mediation Board, 66 App. D.C. 375, 88 F.2d 757, and Brotherhood of Ry. and S. S. Clerks v. Nashville, C. & St. L. Ry., 6 Cir., 94 F.2d 97. The statute, 45 U. S.C.A. § 152(4), provides that the majority of any craft or class of employees shall have the right to determine who shall be their representative. Both of the cited cases hold that Congress intended to adopt the designation of class or craft as determined by the working agreement between the railroad and particular groups or classes of employees. The Board may of course make a finding of fact as to what class or craft did represent a group of employees at the time of the passage of the Act, but the Board has no power to make classifications of its own irrespective of the past history of the carrier and employees with which it may be dealing. The Board has not attempted to make any finding of fact in the present case. Indeed it would be impossible upon the evidence to find other than that the clerks have always been in a single class to themselves. The conclusion of the District Judge in this connection was justified. He said:

"The fact that the clerks of the Railway had maintained, in form at least, a separate and distinct organization for many years; that they had never affiliated with the miscellaneous employees and there had never prior to this controversy been any attempt to combine the two classes; that the services performed by the two hundred and eighteen (218) clerks required them to be fitted and qualified by education, training and qualities of personal character and integrity, and that their services were entirely clerical; that the undertaking to combine

the two emanated from outside sources and the miscellaneous employees alone; that there was strong opposition among the clerks to such combination regardless of whether their bargaining agent was the Brotherhood or the Committee; that in the conferences and negotiations which occurred between Mediator Foran and representatives of the Brotherhood and the Committee, the clerks were treated as a class, separate and distinct, and in no way affiliated with the miscellaneous employees, and that no sound reason exists for combining the two groups in a single class against the wishes of the clerks, renders the action of the Board in combining the two groups in a single class contrary to the intent of the statute and invalid."

The conclusion of the court on this appeal that the clerks and miscellaneous employees were not placed in the same class by the certification of the Board will come with the shock of a great surprise to all the parties to the case. To say that the designation of the same representative to represent two groups does not unite the groups for purposes of representation presents an interpretation of the Board's certificate that did not occur to the District Judge or to the attorney for any party in the trial. Indeed counsel defending the action of the Board in this court used one-third of their brief in support of the proposition that the Board properly found that the clerks and the miscellaneous employees constitute a *single* class or craft of employees. It is hardly worth while to labor the point; for it is beyond doubt that the clerks who signed the cards authorizing the Brotherhood to speak for them had no idea that for all practical bargaining purposes they would be classed with the miscellaneous workmen.

If the Board's certification is denied recognition in the instant case, as it should be, the Board will not be denied the right to settle the dispute, for it may still consider all the relevant circumstances and exercise its statutory power justly and efficiently; the Brotherhood will not be denied the right to represent the clerks, if it is proved to be their actual choice; the Committee will not be recognized as a legitimate bargaining agency, if it is in fact dominated by the carrier; but the employees, whose protection is the paramount duty of the court, will be accorded their full right of free choice as contemplated by the statute.