SWITCHMEN'S UNION OF NORTH AMER-
ICA et al. v. NATIONAL MEDIATION
BOARD et al.

No. 8346.

United States Court of Appeals for the
District of Columbia.

Decided Feb. 15, 1943.

Writ of Certiorari Granted May 24, 1943.
See 63 S.Ct. 1175, 87 L.Ed. ——.

Mr. Donald R. Richberg, of Washington, D. C., with whom Mr. Rufus G. Poole, of Washington, D. C., was on the brief, for appellants.

Mr. Robert L. Stern, Special Assistant to the Attorney General, with whom Assistant Attorney General, Mr. T. W. Arnold, and Mr. John H. D. Wigger, Special Attorney, Department of Justice, of Washington, D. C., were on the brief, for appellee National Mediation Board.

Mr. Bernard M. Savage, of Baltimore, Md., with whom Mr. Alfred L. Bennett, of Washington, D. C., was on the brief, for appellee Brotherhood of Railroad Trainmen.

Before GRONER, Chief Justice, and VINSON and RUTLEDGE, Associate Justices.

VINSON, Associate Justice.

This appeal concerns a jurisdictional dispute under the Railway Labor Act[1] between the appellee Brotherhood of Railroad Trainmen (Brotherhood), and the Switchmen's Union of North America (Switchmen's Union), appellants. The right to represent the 6,087 yardmen[2] em-

---

[1] Act of May 20, 1926, 44 Stat. 577, c. 347, § 1, as amended by the Act of June 21, 1934, 48 Stat. 1185, c. 691, § 1, and the Act of Aug. 13, 1940, 54 Stat. 785, c. 664, §§ 2, 3; 45 U.S.C.A. §§ 151-153.

[2] The figure was submitted as an approximation.

ployed in the several yards of the New York Central Railroad Company is the subject of controversy. The Brotherhood invoked the services of the appellee National Mediation Board (Board), presenting signed authorizations of 4,749 of the yardmen. The Board investigated the alleged dispute and held a hearing in which it made two important findings: (1) the New York Central Railroad Company is a single carrier for the purposes of the Act;[3] (2) as a matter of law, the Act vested the Board with no discretion to split a single carrier for the purpose of determining those eligible to vote for the representative of a craft or class.

The Board conducted an election in which an overwhelming number[4] of yardmen voted to be represented by the Brotherhood. The Board accordingly certified the latter as sole representative of all yardmen employed by the New York Central Railroad Company. The Switchmen's Union contested the certification, but was denied injunctive relief therefrom by the District Court. The Switchmen's Union is contending here that certain portions of the New York Central Railroad Company's lines, wherein it has acquired separate representation contracts with the yardmen, are separate carriers, and that the yardmen working thereon are separate crafts or classes entitled to a separate representation. Both the Board and the District Court have found these contentions to be without merit. The remainder of this opinion will develop the basis for our conviction that the judgment must be affirmed

It should be stated at the outset that we are not concerned with whether the Railroad Company can be considered a single carrier *for all purposes*. It is our province only to determine whether the Board was empowered by Congress to treat it as a unit *for the purposes of collective bargaining*.

## I. *The Integral Character of the Railroad Company.*

The present composition of the New York Central Railroad Company is the con-

sequence of consolidation and the acquisition of long term lease interests in sister railroads. In 1914, the New York Central and Hudson River Railroad Company,[5] operating from New York to Buffalo, and the Lake Shore and Michigan Southern Railway Company, operating from Buffalo to Chicago, consolidated to form the New York Central Railroad Company. These two once separate sections of the consolidated railroad, while now commonly referred to respectively as New York Central-Lines East and New York Central-Lines West, are simply operating regions and have no corporate existence.

The Boston and Albany Railroad Company, the Michigan Central Railroad Company, the Big Four,[6] and the Toledo and Ohio Central Railway Company are now a part of the New York Central Railroad Company, which operates these lines under long term leases. Three of these leases are for 99 years, renewable in perpetuity; the fourth terminates with the corporate existence of the lessor.[7] Further, the New York Central Railroad Company has acquired 99.44 percent of the stock of the Michigan Central, 98.45 percent of the common stock and 85.18 percent of the preferred stock of Big Four, and a corporate interest in the Toledo and Ohio Central in excess of the amount necessary to possess a controlling ownership therein. It owns no stock in the Boston and Albany Railroad. All of the railroads hereinbefore referred to are now collectively known and designated as the New York Central Railroad Company, herein usually called the Railroad Company.

For many years, the yardmen working on the Railroad Company's lines have been employed solely by the Railroad Company; they have been represented by and are working under contracts negotiated by either the Brotherhood or the Switchmen's Union. On July 2, 1940, when the services of the Board were invoked, the Brotherhood represented all the yards on the Big Four, Toledo and Ohio Central, Boston and Albany, New York Central-Lines East,

---

[3] The Railway Labor Act, as amended in 1934, cited supra note 1, will be so designated throughout the opinion.

[4] Of 7,187 employees eligible to vote, 4,112 voted for the Brotherhood and 941 for the Switchmen's Union. More were entitled to vote than were presently employed as yardmen.

[5] The Boston and Albany Railroad

Company was leased in 1900 by the old New York Central and Hudson River Railroad Company.

[6] Cleveland, Cincinnati, Chicago, and St. Louis Railway Company.

[7] The lease on the Toledo and Ohio Central Railway Company endures for the corporate existence of the lessor.

788

those yards on the Michigan Central east of the Detroit River,[8] and nine yards on the New York Central-Lines West. The Switchmen's Union represented those yards on the Michigan Central west of the Detroit River and all but nine yards on the New York Central-Lines West.

The Act, as amended in 1934, expresses the purpose of providing for "the complete independence of carriers and of employees in the matter of self-organization". Section 1, First, purports to define a carrier: "The term 'carrier' includes any express company, sleeping-car company, carrier by railroad, subject to the Interstate Commerce Act [chapter 1 of Title 49], and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad * * *."[9]

▆ Appellants contend that, by the terms of the definition in Section 1, First, in which a "carrier" includes *"any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad"*, the two lines upon which they have acquired representation contracts are carriers, and separate carriers by the terms of the Act. When the clause relied upon is replaced in its context and the section viewed in toto, it cannot be given the construction which appellants urge. That portion of the definition which precedes the italicized quotation appears to be inclusive of all functions of a carrier's railroad cars. We believe the remainder of the sentence is designed to include all the auxiliary services performed by instrumentalities other than railroads over which the carrier has the designated control. The words "any company", as used in the italicized excerpt relied upon by appellants, do not, in our opinion, mean "any *railroad* company"; instead the purpose of the words is to designate *other* types of companies which are owned or controlled by a carrier and employed for the enumerated purposes, and to place these companies under the authority of the Board.[10] [Italics supplied]

In any event, it is a sufficient answer to the appellants' argument to say that, even if we misinterpret the somewhat ambiguous definitive provisions of this section, and Congress indeed meant that a *railroad* company so owned or controlled by a carrier was to be considered as a "carrier" for the purposes of the Act, the appellants' position still begs the question. Even if a *railroad* company so owned or controlled was intended to be a "carrier", there is nothing in the definition to show that it was intended to be a *separate* carrier. The inference is as valid that, by being so owned and controlled, the railroad company was to be considered *as a part* of the carrier that owned or controlled it.

We feel it is necessary to set out at this point the remaining relative sections of the Act as amended in 1934, in order that the evidence to follow may be examined with a mind to the legislative purpose:

"Section 2 [§ 152]. * * * Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Act [chapter].

* * * * *

"Ninth. If any dispute shall arise *among a carrier's employees* as to who are

---

8 A portion of the lines east of the Detroit River is in Canada. No attempt was made to place this portion under the jurisdiction of the Board, and it is not involved in this controversy.

9 48 Stat. 1185, 1186, 45 U.S.C.A. § 151.

10 The phrasing of the 1926 Act, which, according to the reports of the Congressional Committees handling the bill, meant the same as the 1934 amendment section which corresponds with it, confirms this construction. "The term 'carrier' includes any express company, sleeping-car company, and any carrier by railroad, subject to the Interstate Commerce Act, including all floating equipment such as boats, barges, tugs, bridges and ferries; and other transportation facilities used by or operated in connection with any such carrier by railroad, and any receiver," etc. 44 Stat. 577. Further, the words in Section 1, First, of the Act, "which operates any equipment or facilities or performs any service", should be read as if followed by the words "in connection with transportation services performed by railroads," according to the testimony of Joseph B. Eastman, who drafted the Act.

the representatives of such employees designated and authorized in accordance with the requirements of this Act [chapter], it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. ,)on receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act [chapter]. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated *the Board shall designate who may participate in the election* and establish the rules to govern the election * * *." [Italics supplied]

The evidence of the organization and management of the Railroad Company is most compelling upon the question of its integral character for the purposes of the Act. None of the lessor-divisions, i. e., the Big Four, Michigan Central, etc., operates any equipment, conducts any transportation or service, or employs or pays any of the yardmen who are working upon its lines. All of these operations are performed solely by the Railroad Company. Each of the lessor-divisions has long term leases, in turn, on a number of smaller railroads, but they are now operated by the Railroad Company under its lease with the intermediate lessors.

· Railway Company officers, such as Executive Vice President, Vice President in charge of Accounting, Vice President in charge of Finance, Vice President in charge of Construction, Real Estate and Developments, and Vice President of Purchases and Stores, deal with policies applicable to all of the properties, and coordinate activities where the use of more than one part of the system is involved. The Executive Vice President of the Rail-

road Company coordinates the activities of the Mechanical and Maintenance of Way Departments. Train service coordination is secured through managers of passenger and freight transportation who plan and supervise the services affecting all lines. Corresponding officers on the separate properties look after detailed operations thereon. For some purposes, but not all, the Railroad Company treats the leased lines as separate divisions, just as its Lines East and West are operated; but the evidence tends to show that all executive authority is centralized in the officials of the railroads as a whole, and that all important questions are decided by them.

Management of the Railroad Company's affairs follows neither the corporate nor geographical lines of the divisions. The Superintendent at Toledo has jurisdiction over the entire Toledo Terminal, in which are included portions of the Michigan Central, New York Central-Lines West, and the Toledo and Ohio Central. The timekeeping department located at Detroit handles payrolls for the New York Central-Lines West, Michigan Central, Big Four, and the Toledo and Ohio Central; the payrolls for the New York Central-Lines East and the Boston and Albany are prepared in Utica. The Superintendent of the Western Division has jurisdiction over the Illinois Division of the New York Central-Lines West, the Western Division of Michigan Central, the Michigan Central yards in Chicago, and the Big Four yards at Danville, Illinois. The jurisdiction of the Medical Director of the Railroad Company extends throughout the entire system, with the possible exception of the Boston and Albany, as a result of a gradual unification process. The New York Office of the Railroad Company has to approve expenditures for equipment on the subsidiary lines. Since 1935, engine numbers on the Big Four locomotives have been changed to correspond with the Railroad Company's locomotive numbers, and in similar fashion, numbers on box cars and other equipment have been conformed, even when such equipment does not leave the lines of the Big Four. No per diem charge is exacted on locomotives and cars exchanged between these lines.

Negotiations between management and representatives of employees are subject to the general supervision of the Vice President-Personnel of the Railroad Company. Although his function is primarily

that of advisor, he has, on occasion, participated in actual changes in rules or working conditions applicable only to certain subsidiaries. With respect to employee grievances, bureaus have been established at certain points not necessarily corresponding to the several divisions. In some cases the handling of grievances has been concluded with the bureau or Vice President located at the particular point; in other instances, the grievances have been handled by the Vice President-Personnel before submitting them to the National Railroad Adjustment Board. Existing agreements between the management and representatives of other crafts or classes vary in their territorial scope, but in most instances these agreements cover the employees of a given craft or class on the leased lines separately. Only in the instance of the dining car stewards is there one representative agreement covering all the lines. Many of these agreements had been made before the operations of the leased lines were taken over by the Railroad Company. There has not been a general movement on the part of either management or employees to adopt agreements covering the entire organization. There have been, however, several instances of merging seniority rosters of yardmen in service on different divisions.[11] There is evidence, for instance, that the Switchmen's Union, itself, has combined the Michigan Central and New York Central-Lines West in this regard.

The manner in which reports are made to the Interstate Commerce Commission is additional support for the conclusion we reach. Since the Railroad Company manages all operations and pays and controls all the employees, it files with the Commission one annual operating report for the entire organization. These reports are not broken down to show the operation results of the several divisions. The Railroad Company also files thirteen different monthly and quarterly reports which include the results of operations over all of its lines. A few of these monthly and quarterly reports are filed separately by the Boston and Albany,[12] but important reports, such as Operating Revenues and Operating Expenses, Selected Income and Balance Sheet Items, Railway Accidents, and freight tonnage are reported by the Railroad Company for all the lines. The leased lines retain their corporate identity and file annual *financial reports* with the Interstate Commerce Commission. Also, separate monthly accident reports are filed *for* them, all of which are signed by the General Claims Attorney of the Railroad Company; the Railroad Company similarly segregates the monthly accident reports of its Lines East and West.

The Board has admitted in its brief that the lessor lines might still be considered carriers under the Act in a purely technical sense as they remain subject to the Commission in filing the annual financial reports. The Board argues, however, that the Act deals with relations between carriers and employees engaged in performing transportation, and was obviously intended to apply to operating carriers, not to bare corporate entities which exist only for the purpose of receiving rentals and distributing the proceeds; and that the Board was justified for the purposes of the Act in determining that the carrier is the operating entity by which the workers are employed, rather than the corporate shell which has nothing to do with the operations of the railroad or its labor relations. We believe that the words of the Act support this contention. The Act gives the Board certain powers "If any dispute shall arise *among a carrier's employees*". [Italics supplied] The Michigan Central and the New York Central-Lines West (as well as the other leased lines) do not employ any yardmen. The Railroad Company hires and pays the yardmen on all the lines. Part of these yardmen may *work* on the Michigan Central or some other division, but they are not employed, paid, or controlled by that division, but by the Railroad Company. The only employer involved in this case is the Railroad Com-

---

[11] One such instance is where the rosters of yardmen on the Michigan Central were set behind the rosters of the yardmen on the New York Central-West at Toledo. As a result any new yardmen hired thereafter would have seniority on both the New York Central and the Michigan Central. Similarly, New York Central yardmen were included in the rosters of Michigan Central yardmen located at Detroit, Lansing, and Jackson, Michigan.

[12] The record shows that the separate reports for this line were filed at the specific request of the Commission, which desires this breakdown of information because of the relative statistical importance of that division of the Railroad Company in the New England region.

pany; the only employees involved are its employees.

The foregoing evidence relating to the correlated management and operation, the conduct of labor relations, and the manner of reporting to the Interstate Commerce Commission, stands substantially unchallenged. It amply substantiates the finding of the Board and the District Court that the Railroad Company constitutes a single carrier for representation purposes. The Act has been so interpreted by the Board since its first annual report. We quote from it:

"* * * Although the term 'carrier' is clearly defined in the Act, questions have arisen in connection with representation disputes which made it necessary for the Board to interpret its meaning. * * * The Board has ruled generally that where a subsidiary corporation reports separately to the Interstate Commerce Commission, and keeps its own payroll and seniority rosters, it is a carrier as defined in the Act, and its employees are entitled to representation separate from other carriers who may be connected with the same railroad system.

"If the operations of a subsidiary are jointly managed with operations of other carriers and the employees have also been merged and are subject to the direction of a single management, then the larger unit of management is taken to be the carrier rather than the individual subsidiary companies." [13]

The Board's decisions have been based upon this interpretation, and two or more lines have been held to be single carriers for the purposes of the Act in several instances.[14] The Board has previously considered the Railroad Company a single carrier for the purpose of determining the representative of dining car stewards thereon.[15] A comparison of the New York Central Railroad Company with what is commonly called the New York Central Railroad *System* will serve as a further indication that the former is a unified entity under a single management. The Railroad Company, in addition to its holdings heretofore listed, has a stock interest in the Pittsburgh and Lake Erie Railroad Company, the Indiana Harbor Belt Railroad Company, and the Chicago River and Indiana Railroad Company, together with its lessor, the Chicago Junction Railway. These, however, are all operating roads— that is to say, they are not operated by the Railroad Company, and they report separately to the Interstate Commerce Commission. The New York Central Railroad System is the New York Central Railroad Company plus these four roads. It is not contended that the Railroad System, on which there are independent operating units, is a single carrier. Only that part of the Railroad System which is operated as a unit has been unified for collective bargaining purposes.[16]

We. hold, therefore, that it was the intention of Congress that it should vest in the discretion of the Board whether or not to consider an organization operated and managed in the manner of the Railroad Company a single carrier for the purposes of the Act. The finding of the Board clearly involves no abuse of discretion. It seems a very reasonable conclusion to reach from the evidence presented. We are without power, therefore, to alter the Board's decision as sustained by the District Court.[17]

---

[13] First Annual Report for the fiscal year ending June 30, 1935, p. 22. See also National Mediation Board, The Railway Labor Act and the National Mediation Board (1940), p. 17.

[14] In the matter of Representation of Employees of the New York, Chicago and St. Louis Railroad (Switchmen), Case R-74; In the matter of the Representation of Employees of the New York, Chicago & St. Louis Railroad Co. (Maintenance of Way Employees), Case R-248.

[15] In the matter of the Representation of Employees of the New York Central Railroad System (Dining Car Stewards), Case R-263.

[16] In the Official Railway Guide for December, 1940, p. 134, the caption for the New York Central Railroad System is: "The New York Central Railroad Company; Pittsburgh & Lake Erie Railroad Company; Indiana Harbor Belt Railroad Company; Chicago River & Indiana Railroad Company; Chicago Junction Railway (C. R. & I. R. R. Co. lessee)." The description does not include or mention the so-called Boston and Albany, Michigan Central, Big Four, or Toledo and Ohio Central.

[17] Shields v. Utah Idaho Central Railroad Co., 305 U.S. 177, 185, 59 S.Ct. 160, 83 L.Ed. 111; Brotherhood of Railway & Steamship Clerks, etc., v. Virginian Railway Co., 4 Cir., 125 F.2d 853, 857; Chicago, S. S. & S. B. R. R. v. Fleming, 7 Cir., 109 F.2d 419, 420; Nashville, etc., Ry. v. Railway Employees' Department, etc., 6 Cir., 93 F.2d 340, 342, certiorari

## II. *The Yardmen Constituted a Single Craft or Class.*

██ The remaining question concerns the propriety of the Board's finding that all the yardmen employed by the Railroad Company constitute a single class or craft. The issue is whether, when the employees of a single craft or class have organized, bargained, and made contracts with their employer by groups or divisions, the Board is compelled, upon a proper invocation of its services, to destroy these groupings by forcing the same into a single bargaining unit. Appellants admit that, were there no separate existing contracts as here, the action of the Board in unifying the Railroad Company might be proper; but that, as it is, the Board is confined to the dispute of the particular division under the existing contract. We believe appellants come close to admitting themselves into a losing position. The Act plainly provides that the *majority* of any craft or class shall determine *the representative* (not representative*s*) of the craft or class for the purposes of the Act. Appellants cannot complain of interference with their contracts if the provision is a lawful exercise of Congressional authority. Their contracts were necessarily made subject to that authority. It is an established principle that appellants must be considered to have made their contracts in contemplation of the contingency that they might be invalidated by a proper exercise of legislative power.[18] The contention of appellants would render the Board powerless to act no matter how unified the craft or how determined the members thereof for a particular representative, so long as any part or group thereof had acquired another representative. The Board would be deprived of the power to determine which members of the class or craft could participate in an election whenever a jurisdictional issue was raised—a power expressly delegated to it by Section 2, Ninth, which has been sustained by the courts on numerous occasions.[19] The purpose of the Act was to enable the Board to unify the craft; no proviso of the nature contended by appellants modifies its powers in this regard.

It is true that there is an expression in Section 2, Fourth, that "Employees shall have the right to * * * bargain collectively through representatives of their own choosing", but "employees" is qualified and defined by the sentence following. It is there clearly stated that not any group, part or division of a craft or class is entitled to a representative of its own choosing, but that only the "majority of any craft or class of employees" may do so.[20] Appellants have cited cases which hold that Congress intended employees to

---

denied 303 U.S. 649, 58 S.Ct. 746, 82 L. Ed. 1110; National Federation of Railway Workers v. National Mediation Board, 71 App.D.C. 266, 270, 110 F.2d 529, 533, certiorari denied 310 U.S. 628, 60 S.Ct. 975, 84 L.Ed. 1399.

[18] National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 610, 55 S.Ct. 570, 79 L.Ed. 1086; Sproles v. Binford, 286 U.S. 374, 390, 52 S.Ct. 581, 76 L.Ed. 1167; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U.S. 372, 375, 39 S.Ct. 117, 63 L.Ed. 309, 9 A.L.R. 1420.

In Franklin v. Pennsylvania-Reading Seashore Lines, 122 N.J.Eq. 205, 193 A. 712, 718, rosters of seniority, priority, and the positions of employees were consolidated after the unification of two railroads. The complaining employee representative raised the question that a contract existed between the men and the railroad by which they had protected seniority rights because of employment upon the former separate lines. The court held: " * * * It would seem that

such rights as existed respecting the former railroads ceased upon the men becoming employees of the defendant railroad company * * *."

[19] Association of Clerical Employees, etc., v. Brotherhood of Railway and Steamship Clerks, 7 Cir., 85 F.2d 152, 109 A.L.R. 345; Chicago, S. S. & S. B. R. R. v. Fleming, 7 Cir., 109 F.2d 419; Brotherhood of Railroad Trainmen v. National Mediation Board, 66 App.D.C. 375, 88 F.2d 757; Brotherhood of Locomotive Firemen, etc., v. Kenan, 5 Cir., 87 F.2d 651, certiorari denied 301 U.S. 687, 57 S.Ct. 790, 81 L.Ed. 1344.

[20] It is to be noted that, in the Act, the term "representative" is always used in the singular when associated with the phrase "craft or class", but in the plural when associated with the word "employees". The two terms, "craft or class" and "employees", are not interchangeable. The employees of a railroad include many crafts or classes. Section 2, Ninth, says, in effect, that when *employees* are involved in *a dispute*, the Board shall select the *representatives* thereof. We submit that there is no inconsistency in the word "dispute" ap-

be given the right to retain the crafts or classes as they were formerly recognized or established by mutual agreement between employee and carrier.[21] It is sufficient, however, to say that these cases were concerned with disputes as to the craft or class to which the nature of an employee's work entitled him to belong, and not with the area which was to be considered the compass of that craft or class. These cases are based, in part, upon a section of the Act which provides: "* * * no occupational classification made by order of the Interstate Commerce Commission shall be construed to define the crafts according to which railway employees may be organized by their voluntary action, *nor shall the jurisdiction or powers of such employee organizations* [craft organizations] *be regarded as in any way limited or defined by the provisions of this Act* [chapter] * * *."[22] [Italics supplied]

While this section may give some stability to existing craft or class arrangements, it does not do so to the extent of allowing the maintenance of a particular representation arrangement which encompasses less than the whole of an established and recognized craft or class. There was no dispute here as to what constituted a yardman, or whether any particular group were or were not yardmen, or whether any particular group were or were not entitled to vote along with yardmen; therefore, the language of the cases cited by appellants is not applicable. We have found no decision echoing this language where a controversy over the scope of the bargaining unit existed, when it was agreed that all of the employees involved were members of the same craft. We therefore deny that Congress intended any geographical or divisional connotation to be given to the term "craft or class"; it was intended only in the occupational or functional sense and not in the fractional, divisional, or regional sense.

Excepting only situations similar to that presented in Brotherhood of Railroad Trainmen v. National Mediation Board,[23] decided this day, our underlying premise is that the term "craft" has an accepted and established meaning both in the popular understanding and in labor circles. It was left undefined by the Act, as was its disjunctive partner. While "craft" and "class" may not be synonymous as used in the Act, this could only be because "class" may be more comprehensive.

The term "craft" has been defined as "Those engaged in any trade, taken collectively". The term "class" has been defined as "A group of individuals ranked together as possessing common characteristics or as having the same status".[24] The author of the bill, Mr. Eastman, explained the term "craft or class", as he had used it, to the Congressional Committee, as *"all* of the employees of the carrier, *no matter in what shop they were located, who did that particular kind of work.*[25] [Italics supplied] It follows that merely because one, or a number, is kept geographically remote or separated from the group, that fact does not make him any the less a member of that craft or class. Neither may a craft or class be considered as nonexistent or artificially dissected because its members were originally organized for a limited purpose, i. e., representation, by geographical segments.

Admittedly, an arbitrary division of a craft into geographical groups will sustain the use of the word "class", in the broadest sense of the word, in describing one of the resulting segments. Thus, Craft X might be considered as partitioned into two classes, i. e., Class I—Craft X, north of the river, and Class II—Craft X, south of the river; but we insist that such a partitional arrangement could not create two *crafts.* Thus, if "class", as used in the Act, is to be considered in this broad, unrestricted sense, and not as qualified or

pearing in the singular, in this instance, as it may be that more than one craft will be represented by the employees involved in that dispute, thus necessitating the designation of multiple representatives.

21 Brotherhood of Railroad Trainmen v. National Mediation Board, cited supra, note 19; Order of Railway Conductors of America v. National Mediation Board, 72 App.D.C. 299, 113 F.2d 531; Brotherhood of Railway and Steamship Clerks,

etc., v. Nashville, C. & St. L. R. Co., 6 Cir., 94 F.2d 97.

22 Section 1, Fifth.

23 — U.S.App.D.C. —, 135 F.2d 780, decided February 15, 1943.

24 See Webster's New International Dictionary (2d ed., 1939); 10 Words and Phrases, Perm.Ed., p. 322; 7 Words and Phrases, Perm.Ed., p. 427 (compare "class" as used in the law of wills).

25 See note 31 infra.

tempered by its association with the word "craft", the Board would be empowered, in its discretion,‑ to divide a craft into the most minute regional units, because—upon some pretext or other—each might still be designated as a "class". We feel that the implications of any such interpretation run counter to the language and purpose of the Act. We need only point to the plain, clear, and unequivocal manner of expression used by Congress when it indeed intended so to empower an administrative agency with such broad discretion. We present, by way of contrast, the delegation of authority to the National Labor Relations Board in this regard:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees *in a unit appropriate for such purposes,* shall be the exclusive representatives of all the employees *in such unit* * * * [N. B., the absence of the terms 'craft' or 'class'.]

"The Board shall decide in each case whether * * * *the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."* [26] [Italics supplied]

It is urged that by this specific and detailed language, Congress intended no more than is contained in the simple phrase "craft or class" as used in the Railway Labor Act. We cannot agree. We think it manifest, from a comparison of the related clauses of the two Acts, that the National Mediation Board does not enjoy that wide latitude of discretion which Congress has granted to the National Labor Relations Board. The Railway Labor Act deals only in terms of "craft or class"; no other *unit*

for collective bargaining is considered. There is no authorization to the Board to subdivide or sectionalize, or to designate a representative upon any other basis than the craft or class unit.

 The Board has found the Railroad Company to be a single carrier. None of the yardmen here is involved or affected by any agreement altering craft or class lines.[27] Under these circumstances, it necessarily follows that all of the employees of the Railroad Company engaged in the same character of work are members of the same craft or class. What possible purpose or authority is vested in the Board to designate a combination of lines a single carrier except for just this purpose? The sole function of the Board in this regard is to provide employees with representation as authorized by Congress. When it finds a single carrier, it does so only to determine the scope of the bargaining unit. The Board has in several instances ruled that it had no discretionary powers to divide employees for election purposes along regional lines.[28] It acknowledges, and the record indicates, that it has in several cases acquiesced in divisional representation where the question of a single carrier was not raised or where *all* the organizations involved agreed to the regional representation. Where, however, the question was raised, or where there existed a single dissident to the partitional arrangement, the Board insists that it has considered that it had no discretion and that it has decided that it was bound to certify a single representative for the entire system. We think the Board's interpretation is consistent with the intent of Congress.[29] In any event we are not here concerned with a

---

[26] Act of July 5, 1935, 49 Stat. 453, c. 372, § 9, 29 U.S.C.A. § 159.

[27] Brotherhood of Railroad Trainmen v. National Mediation Board, cited supra, note 23; Brotherhood of Railroad Trainmen v. National Mediation Board, 66 App.D.C. 375, 88 F.2d 757; Brotherhood of Railway and Steamship Clerks, etc., v. Nashville, C. & St. L. R. Co., 6 Cir., 94 F.2d 97.

[28] See notes 14 and 15 supra.

[29] In May, 1936, two years after the 1934 amendments, the so-called "Washington Agreement" was entered into by the Railroad Company and many other carriers, on the one hand, and the Switchmen's Union and many other organizations representing railroad employees, on the other. The Agreement

contained certain provisions for the protection of employees who would be displaced by any later consolidation, merger, or unification of the signatory carriers. The Railroad Company was at that time considered so unified that it was therein designated as a single carrier for the purposes of the Agreement, i. e., any further coordination of the facilities of the component lines of the Railroad Company was not to be subject to the terms of the Agreement. All of the leased lines of the Railroad Company were therein termed "Properties and Operations included in the authorization *as part of, and to be considered as part of*" the Railroad Company. [Italics supplied] In the Agreement, over one hundred carriers and over twenty employee organiza-

case in which the Board has allowed a partitional arrangement. All of the employees here involved are unquestionably yardmen, all are considered and treated as yardmen, all have aligned themselves (as far as the record indicates) exclusively with yardmen organizations, none has aligned himself with any other craft for bargaining purposes. The Act provides that on a carrier, the majority of the employees of a craft or class *shall have the right* to designate the organization which shall represent the *entire* craft or class on that carrier. The Board, therefore, has no discretion to divide the craft or class when one of the employees' representatives *insists* that the terms of the Act be carried into effect. To do otherwise would be to *deny* the majority of the craft or class *a right* expressly granted to them by the Act. The Board has operated under this policy since the 1934 amendments. Even if the question of the lack of power in the Board to divide a single carrier was "nicely balanced" (which we firmly believe it not to be), the long standing administrative interpretation and practice would upset that balance in the direction of validity.[30] It may be worthy of note that Congress amended the Act in 1940 in an irrelevant respect, but did nothing to affect this practice.

There are other evidences of Congressional intent which reinforce the position we take. The 1934 amendments to the Act were originally prepared and explained to the Congressional Committees by their author, Mr. Eastman, then Federal Coordinator of Transportation. In answer to questions by a member of the House Committee on Interstate and Foreign Commerce, he testified upon this precise point, saying that the majority of any class or craft of employees should have the right to determine the bargaining agent:

"Mr. Huddleston. For illustration, let us take the case, we will say, of the machinists at a given shop when there are other machinists employed at other shops. Would these machinists at that particular shop be able to get together under this sentence and bargain with their employer?

"Commissioner Eastman. Well, my understanding of the way in which the words 'craft' or 'class' have been defined in the past, is that *they would cover the entire service of any particular carrier.* That is, it would not be a *class* of employees, to pick out those that did work in a particular shop, but it would be *all of the employees of the carrier, no matter in what shop they were located, who did that particular kind of work.*

"Mr. Huddleston. For that *particular employer?*

"Commissioner Eastman. Yes, for that *particular employer.*"[31] [Italics supplied]

Mr. M. W. Clement, chairman of the committee of the railroads designated to deal with the proposed amendments to the Act, opposed the majority rule provisions because he apparently thought that the craft or class unit was to be carrier wide. He said that the Act as drafted (and finally passed) would permit the employees in one division or territory of greater employee density, working under agreement with one organization, to upset the will of the majority of the employees in another territory, of lesser employee density, who were working under agreement with another organization. He urged, but was unable to persuade, the Interstate and Foreign Commerce Committee of the House to add the following proviso to prevent this result:[32] "Provided, that only each class or craft *embraced in any existing agreement* shall be the employees to be considered to determine the majority of such employees for the purposes of representation." [Italics supplied]

To the same end, Mr. Clement attempted to persuade the Senate Committee on Interstate Commerce to amend Section 2, Ninth, as follows, by adding the italicized words and omitting the words enclosed in brackets:[33] "If any dispute shall arise between a carrier's employees *or a group thereof* as to who are the representatives of such employees *or a group thereof* * * *, it shall be the duty of the Mediation Board * * * (etc.) * * *. Upon receipt of such certification the carrier

---

tions (including appellants) treated the Railroad Company as a single carrier for this important purpose.

[30] Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 329–331, 59 S.Ct. 191, 83 L.Ed. 195, rehearing denied 305 U.S. 675, 59 S.Ct. 356, 83 L.Ed. 437.

[31] Hearings before Committee on Interstate and Foreign Commerce on H.R. 7650, 73d Cong., 2d Sess. (1934) 57.

[32] Id. at 126, 128.

[33] Hearings before Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess. (1934) 65.

796

shall treat with the representative so certified as the representative of the [craft or class] *such employees or group thereof* for the purposes of this Act. * * *"

John G. Walber, Vice President of Personnel of the Railroad Company, also testified before the House Committee on Interstate and Foreign Commerce. He agreed with Mr. Clement's interpretation and expressed his objections by an illustration which is indeed interesting: "A local situation on the New York Central will illustrate my point. On what *was* the Lake Shore & Michigan Southern there are agreements with the Switchmen's Union who represent the men in certain yards, and the Brotherhood of Railroad Trainmen who represent the yardmen in other yards. This condition has existed for 30 years or more. There are no complications. The yards are separate and distinct from each other, and the seniority of switchmen is confined to the particular yard. *However, if the proposed amendments* [1934 amendments to the Railway Labor Act] *are adopted, the men would have a perfect right to reopen the question of representation,* and the management would be faced with numerous questions under the law as possible interference with the jurisdiction claimed by the organizations * * *."[34] [Italics supplied]

The situation which Mr. Clement and Mr. Walber sought to prevent is presented by the case at bar. The amendments and alterations proposed by these gentlemen were not adopted by the Committees in the bill as reported, nor contained in the bill as finally passed. The bill was enacted in the form approved by Mr. Eastman. Accordingly, we think that the interpretation given to the bill before the Committees, concurred in by both those favoring it and those opposing it, is a persuasive indication of the legislative intent.

It is doubtlessly arguable that divisional autonomy will afford a larger number of the 6,087 yardmen the representative of their choice. If each yard were voted separately, however, more yet of the yardmen would be accommodated, and if each section of each yard were given a separate representation, still more would have their choice, and so on, until it would be possible to make the units minute enough to give all 6,087 the representative that they wished. However, this is not the purpose or design of the Act. The Act was created to furnish a procedure whereby the employees of a particular craft or class could attain a representation by the organization which the *majority* of that craft or class desired. The larger the number in the class, the more possible dissidents. The larger the class, however, perhaps the more desirable that the employer be able to deal with a single representative, and the more necessary a single contract for effective collective bargaining.

The evidence convincingly demonstrates the integral character of the New York Central Railroad Company. It was within the discretion of the Board to consider the Railroad Company a single carrier under these circumstances. Congress has seen fit to give the Board this power. A majority of the yardmen employed by that carrier have demanded that they be given the right to appoint the representative for their craft. Congress has expressly given those employees this right.

The argument was made to the Congressional Committees that the precise language now under consideration would bring possible repercussion in railway labor relations. Specific amendments were proposed which would have allowed the division of a craft or class. Congress was not persuaded that the unification process was not in the best interest of employees and carriers. It is for Congress to determine policy. Our province is to keep the Board within the confines of that policy. We are of the opinion that the Board correctly determined it had no discretion to deny the request of a majority of the yardmen employed by the Railroad Company to appoint a representative for their craft.

Affirmed.

RUTLEDGE, Associate Justice (dissenting).

I dissent. The majority rightly conclude, I think, that the New York Central Railroad Company should be considered a single carrier for purposes of collective bargaining under the National Railway Labor Act. But I do not think it follows from that fact or the statute's provisions that the Board was required to find, as a matter of law, that all yardmen employed by the company constitute a single unit for

---

[34] Hearings before Committee on Interstate and Foreign Commerce on H.R. 7650, 73d Cong., 2d Sess. (1934) 155.

this purpose. The important issue, as I view the case, is, how shall it be determined, under the Act, what is a "craft or class" of a carrier's employees for collective bargaining.

Broadly stated, there are three possible answers: (1) That the Act had effect to "freeze" railway labor in bargaining units existing, under contract or agreement, when it became effective; (2) that it had the opposite effect, that is, to throw out all existing units less than carrier-wide in scope and require substitution in all cases of carrier-wide craft units; and (3) that the Mediation Board was empowered, when a representation dispute arises, to determine by election or other appropriate means not only who shall be the representative, but also by what units the employees shall be represented if that likewise is in dispute.[1]

In effect, though not in exact form of statement, the first is what the Switchmen advocate. The second is urged by the Brotherhood and accepted by the Board, the District Court and the majority here. In my view, neither is consistent with the terms, purposes and policies of the statute. The consequences, in each case, forbid its acceptance.

The first is too static; the second, too violently disruptive of existing arrangements. The former freezes railway labor in the contractual mold of 1934. The latter disrupts all such arrangements as a matter of law, except as carrier-wide crafts already had been established or in other cases where all of a carrier's employees doing similar work agree to representation by lesser units. I agree with the majority's rejection of the first view and their reasons for doing so, except in so far as they require acceptance of the second. But I think Congress was as far from commanding that all less than carrier-wide units be ousted as it was from concreting all units in the contract mold of 1934.

The view that ouster is required would go far to destroy, rather than to promote, the peace in labor relations and the uninterrupted service of the carriers which were the statute's declared and primary objects. Section 2. It makes the Act an invitation and an instrument for creating labor strife especially in stirring up juris-

dictional disputes. It gives this weapon to, and throws the whole weight of the legislation in favor of, the big unions as against the smaller ones. All that is needed for ouster of the latter is to cause some employee to question or "dispute" their right to act as representative, which a large union can always do. From that point on the ouster is almost automatic. The result of the election is, in these circumstances, a foregone conclusion. The Board becomes merely an election judge, having in effect a ministerial and often only a perfunctory function. This is but a policy of compulsory liquidation of the smaller bargaining units. I do not believe Congress intended to adopt it. Nor do the terms of the statute comport with such an intention.

The majority reach the opposite view largely on two bases. The first is by reading into the statute a definition of "craft or class" as meaning "carrier-wide craft." This is chiefly by inference from Section 2, Fourth, and Section 2, Ninth. The second basis is support for this inference found in the legislative history, particularly in the testimony of Joseph B. Eastman, then Federal Coordinator of Transportation and reputedly author of the 1934 amendments. Section 2, Fourth, quoted in the majority's opinion, with its use of the singular number in the last quoted sentence, is regarded as importing into the statute the geographic definition of "craft or class" as being "carrier-wide craft." One sentence of Section 2, Ninth, lends itself to similar grammatical emphasis: "Upon receipt of such certification *the carrier* shall treat with *the representative* so certified as *the representative* of the *craft or class* for the purposes of this act [chapter]" (Italics supplied).

The difficulty with this view is that neither Section 2, Fourth, nor the quoted sentence from Section 2, Ninth, purports or was intended to define "craft or class" in any way, functionally or geographically. Neither provides for, but each assumes a previous, determination of the craft or class. Given that, Section 2, Fourth, confers on the majority the right to choose the representative, which of necessity must be singular, while the quoted sentence of Section 2, Ninth, requires the carrier to treat with the representative so chosen.

---

[1] A fourth alternative, somewhat akin to the first, is hardly plausible, that the purpose was to leave entirely to the employees, to work out wholly through ex- ercise of their economic sanctions, the definition or constitution of the voting unit.

That the statute contemplated treating with only one representative for one unit is clear. And this sufficiently explains the use of the singular number both in Section 2, Fourth, and in the sentence quoted from Section 2, Ninth. But that either contemplated only one unit for all of a carrier's employees doing the same kind of work does not follow from the language of either section.

Thus, with reference to the sentence quoted above, the preceding and more important sentence is cast in the singular as to the carrier but uses the plural in referring to "representatives," "certify * * * the name *or names* of the *individuals* or *organizations* that have been designated and authorized to represent the employees involved in *the dispute*." (N. B., not "disputes." Italics added) By giving this sentence a corresponding emphasis upon the plural number, the conclusion could be drawn that the statute requires less than carrier-wide units to be designated in all cases. So also the succeeding sentences in Section 2, Ninth, as will appear, rebut both this and the contrary inference of the majority.

Apart from grammar, neither Section 2, Fourth, nor Section 2, Ninth, was intended to supply a definition of "craft or class." They do not purport to do so. Nor does the Act. Its language may be searched from beginning to end without discovery of such a definition. This is significant in view of two facts. One is that the statute is not lacking in definition of terms Congress intended to define. "Carrier," "representative," and other basic terms are defined specifically. The other is that "craft or class" is no less basic or important. It is one of the fundamental conceptions used throughout the Act. Yet there is no semblance of specific definition. Had Congress intended to define the term, and to do so as the majority say was implied, it had only to use the simple and obvious language "carrier-wide craft." It used neither these nor any comparable words. On the contrary, it avoided making any definition of the voting or bargaining unit, and did so intentionally, deliberately and as a matter of policy. The omission was not by oversight or inadvertence. There were reasons, and compelling ones, for making it. This appears, not only from the total absence of specific definitive terms in the Act, but also from the legislative history and especially from the testimony given by Mr. Eastman, set forth in the margin.[2]

The avowed object, in his view, was to leave out any definition of craft or class, and for two reasons. The first was because, generally speaking, such a definition

[2] "Commissioner Eastman * * * Now, it is one of the curses of the labor world at the present time that there are so many of these unfortunate jurisdictional questions. They cause trouble all along the line, and unnecessary trouble, and it seems to me that it is highly desirable to have some neutral agency, tribunal, which is impartial and which can settle these questions, and that is what is undertaken to be done here.

* * * * * * *

"Mr. Wolverton. I desire to know whether your amendment includes a definition of craft or class?

"Commissioner Eastman. No. We thought of that, as to whether or not it was necessary to define craft or class, but those are words which have been used in labor parlance for a very long time, and I think there would be no difficulty in determining what is a craft or class of employees.

"Mr Wolverton. You do not think that without definition they might create disputes between the different classes of employees as to the jurisdiction of each?

"Commissioner Eastman. No; and if there are any disputes I think that that matter is sufficiently covered by the provisions of the ninth paragraph, which provides for the settlement of such disputes, or rather, provides the tribunal which shall have power to consider and determine such disputes.

"Mr. Wolverton. You do not think it is necessary then to define the craft in any specific way?

"Commissioner Eastman. No; I do not think it is necessary.

* * * * * * *

"Mr. Huddleston. How would we resolve an issue where there was a conflict of jurisdiction as to classes and crafts, such, for illustration, as comes up in the classification of employees. We have had some pretty bitter disputes, we will say, between the carpenters and the sheet-metal workers over who should put in metal window frames. That is just an illustration of what sometimes happens, and the trouble has been that nobody could say whether the man doing that work was a carpenter or a sheet-metal worker. What would you do with a situation such as that under this bill?

"Commissioner Eastman. It is the intent that that would be handled under

was regarded as unnecessary. This, in turn, was for the reason that crafts or classes had become widely and definitely crystallized in railroad labor. Hence, in Mr. Eastman's words, "I think there would be no difficulty in determining what is a craft or class of employees." In other words, there was no general necessity for defining craft or class because that term had been defined already by the employees through self-organization. The existing class structure, not one revolutionized by liquidating it and substituting carrier-wide units, supplied the definition and part of the reason for refusing to make an attempt at specific definition in the Act itself. No doubt also the very difficulty of framing a definition which would reflect the existing structure or be acceptable to the forces whose support was essential to the statute's enactment furnished additional and powerful reason for not making the effort. The matter was one better for letting sleeping dogs lie than for stirring them up. The uncontradicted intention to refrain from defining the term is a complete contradiction of the purpose to include, either specifically or by inference from other terms, a definition which would make "craft or class" mean for all cases "carrier-wide craft."

However, there was one outstanding situation, among others, in which the problem of defining the craft or class could not be ignored completely or left to be determined by reference to the existing structure of labor organization. That was the case of the jurisdictional dispute, characterized by Mr. Eastman as "one of the curses of the labor world."[3] The statute anticipated the difficulty. Provision was made in Section 2, Ninth, for taking care of it. At the House Committee hearings Representative Huddleston inquired of Mr. Eastman: "That issue then would be decided by the Board of Mediation?" The witness replied: "That is the intent * * * that is what it was designed to do."[4] In other words, in cases of jurisdictional disputes, as in others wherein the scope of the "craft or class" might be in issue, the Board, not the statute, was to decide upon or define the unit. Mr. Eastman's reference, in this portion of his testimony, obviously was not to Section 2, Fourth, nor to the sentence above quoted from Section 2, Ninth. It was rather to the specific provision of the latter section which empowers the Board to "designate who may participate in the election" or delegate this function to "a committee of three neutral persons." This is the only provision in the entire statute which specifically approaches the problem of defining the voting, and thus the bargaining unit. Consistently with the statute's avowed purpose to leave to

---

the paragraph ninth that I have discussed.

"Mr. Huddleston. That issue then would be decided by the Board of Mediation?

"Commissioner Eastman. That is the intent; whether or not it does provide for every possible contingency, I am not sure but that is what it was designed to do." Hearings before Committee on Interstate and Foreign Commerce on H.R. 7650, 73d Cong., 2d Sess. (1934) 41, 45, 57-8.

Mr. M. W. Clement, chairman of the committee of the railroads designated to deal with the proposed amendments (of 1934), testified at the House hearings:

"Section one, paragraph 5, of the bill distinctly states that neither the provisions of this bill nor any occupational classifications made by the Interstate Commerce Commission shall be construed in any way to define crafts, yet section 9 of this bill puts the problem of jurisdiction of crafts up to the Mediation Board, and places upon them the responsibility of determining those eligible to vote in case of disputed representations, and brings about a complication that neither railroad nor employees know where they are." Hearings before Committee on Interstate and Foreign Commerce on H.R. 7650, 73d Cong., 2d Sess. (1934) 131.

Rejection of the amendment proposed in 1934 by Mr. Clement to remove any doubt concerning the matter was not, in the face of all this evidence that the omission to define "craft or class" was intentional, a backhanded adoption of such a definition. It merely reflected the continued unwillingness of the parties to insert such a definition or their inability to agree upon one mutually satisfactory. It seems fair to assume that if any such definition had been included, the Act would have failed of passage. It was fear that the language might lend itself to Mr. Eastman's stated construction which prompted the tendering of the amendment. Its rejection was not an adoption of the construction. It was rather a retention of the original and intended omission to make any sort of definition.

[3] See the preceding note.
[4] Ibid.

the employees the matter of their own organization as far as possible, and with the corresponding omission to define voting or bargaining units, the provision itself makes no such definition but refers that matter to the Board's judgment whenever it must be faced to avoid a breakdown in the functioning of the Act.

Considering the provisions of Section 2, Ninth, in conjunction with this portion of Mr. Eastman's testimony, it seems clear the statutory purpose was: (1) not to define, but rather deliberately to omit definition of "craft or class," since generally the crystallized status of labor organization would furnish this definition; (2) that, in the exceptional cases in which the issue might arise, the Mediation Board would determine the voting, and thus the bargaining, unit under the power conferred by Section 2, Ninth, and as its judgment based upon the evidence in the particular case, rather than any mandate in the statute itself, might require.

This view derives added strength from the provision authorizing the Board to delegate the functions of holding the election and designating who may participate to a neutral committee. Testimony at the Congressional hearings discloses the reason and purpose of the delegation.[5] These were to enable the Board to escape the onus which might attach to its own discharging of these functions. This arises primarily, if at all, not from merely conducting an election for a predetermined unit, but from determining who may participate. That was the rub which Congress intended the Board to avoid, if it should so desire. In other words, it was clearly contemplated that the Board would be confronted with a highly delicate decision in designating who might vote, which comes down in practical effect to defining the units to be represented, whenever the representation dispute involves this factor.

How this could be true, and why it was necessary to make provision for the Board to relieve itself by delegating the function to others, are difficult to understand, if Section 2, Ninth, already had relieved it as a matter of law by requiring it to designate carrier-wide crafts in all cases. Obviously Mr. Eastman reconciled this inconsistency, as do the majority, by differentiating functional conflicts and geographic or regional conflicts. Only by resort to this distinction can his testimony be regarded as not involving fundamental inconsistency. If the distinction is accepted, the conflict dissolves. In other words, he thought that the statute designedly omitted to make functional definition of "craft or class" along craft lines, but embodied a uniform and invariable definition along geographical or regional lines.

This is the crux of the matter. Clearly the statute left the matter of functional definition, along craft lines, to the Board (or, in its stead, to a neutral committee), when that issue arises in a representation dispute. That seems to be admitted by all. But I cannot agree that it made different provision for definition along geographic lines. This seems clear both from the terms of the Act and from the reasons which required reference of the matter of defining the voting units to the Board. There was no more reason for empowering the Board to determine a functional jurisdictional dispute than a geographic or regional one. There is nothing in the language of the statute which indicates either intent or reason to withdraw one more than the other from the Board's authority. The absence of definitive provision is both geographic and functional—it is total. The language of the Act places no geographic or regional requirement or limitation upon the Board's power, except that the unit must be confined to a carrier's employees. It cannot be greater than that, so as to include others. The reasons applying in the one case, to support the omission, apply equally in the other. If the existing structure of railway labor organization made such definition generally unnecessary in the case of overlapping craft lines, it had like effect as to overlapping geographic lines. The one offers as much possibility for stirring up jurisdictional disputes as the other. The one was as widely and definitely crystal-

---

[5] The Senate Committee report states: "This determination of what employees shall be allowed to vote is one of the most controversial subjects in the settlement of disputes. Your committee amended the bill so that if the Mediation Board found it might arouse antipathy on the part of the carriers or the employees in deciding questions of this kind, it could create a neutral committee to do that work, so its own usefulness of settling disputes that might arise thereafter might not be impaired." Hearings before the Senate Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess. (1934) 3.

lized as the other. Neither would bring more onus to the Board from deciding the issue than the other. Every reason which dictated definition of the one, or omission to define it, did so as to the other. In short, the distinction, considered in the light of the statute's total omission of definitive terms, functional and geographic, and of the equality of application of the reasons, for making the omission to both types of issue, is untenable, notwithstanding its distinguished sponsorship. In that view, it is impossible to reconcile the admitted purpose to omit definition of "craft or class" from the statute's terms and the power it confers on the Board to make this definition when confronted with the necessity, on the one hand, with the view, on the other, that the Act itself defines the voting unit and does so for all cases as a "carrier-wide craft." The situation is one in which the silence of the statute not only is eloquent, but is compelling.

Finally, this view of the Board's function is supported by the declared policy of the Act, set forth in other provisions, which furnishes not an ironclad mold but the necessary standard to guide its administrative discretion or judgment. This policy is to leave to the employees themselves, so far as is possible, the formation of their own units. It is declared in the proviso to Section 1, Fifth,[6] and in my opinion this was not repealed by implication through adoption of the 1934 amendments. It is built upon the history of railway labor organization in the nation. It is reflected in the intentional omission to define "craft or class." It was, without doubt, an essential condition for securing the support necessary for enactment of the legislation. It has been recognized judicially by this court[7] and by others.[8] The administrative practice of the Board has followed it, both in designating representatives for less than carrier-wide units when there has been no disagreement as to this[9] and in using its powers of persuasion and influence to secure agreement among the disputing employees concerning the unit, whether carrier-wide or less extensive.[10] In other words, as appellants say in their brief, the underlying principle written into the Act was the right of self-organization. I think that was just as true regionally as it was with reference to the fixing of craft lines.

But it does not follow that this principle is unlimited. Self-organization does not work, at any rate consistently with the basic purposes of the legislation, when two groups lock horns in death struggle over a no man's land or one invades and seeks to conquer the territory of another. When self-organization leads to war, the limit of the right has been passed. So long as the employees can organize themselves and do so, without entrenching upon each other's or the public domain, the Act preserves their right and the Board has respected it. That it has done so, in my opinion, is not because it has closed its eyes to the policy of the Act for the reason that its juris-

---

[6] "Provided, however, That no occupational classification made by order of the Interstate Commerce Commission shall be construed to define the crafts according to which railway employees may be organized by their voluntary action, nor shall the jurisdiction or powers of such employee organizations be regarded as in any way limited or defined by the provisions of this Act [chapter] or by the orders of the Commission."

[7] Cf. Brotherhood of Railroad Trainmen v. National Mediation Board, 1936, 66 App.D.C. 375, 88 F.2d 757; Order of Railway Conductors v. National Mediation Board, 1940, 72 App.D.C. 299, 113 F. 2d 531.

[8] Brotherhood of Railway and Steamship Clerks v. Nashville, C. & St. L. Ry., 6 Cir., 1937, 94 F.2d 97.

[9] It appears to be conceded that the Board's uniform practice is to certify less than carrier-wide unit representatives when the dispute presents no issue as to the regional or geographic scope of the

unit, and the Board's findings in this case set forth five such certifications. On the other hand, when the dispute presents such an issue, the uniform practice has been to regard the unit as carrier-wide, pursuant to the position taken by the Board in its First Annual Report. Thus, it seems the Board has followed two diametrically opposite policies in administration of the Act, one effective when there is no issue presented as to the area of the craft, the other when such an issue is made. If the Act, as is contended, requires a uniform designation of carrier-wide units as a matter of law, when there is a representation dispute, it is difficult to understand how the so-called "agreement" of the parties, or their failure to raise this phase of the issue, can confer upon the Board authority to certify a representative for a unit not contemplated by its terms or policy. Cf. text, infra, at note 11.

[10] As the record shows is the Board's usual practice, followed in this case.

diction has not been invoked, as would be true if the statute requires carrier-wide units as a matter of law; but is rather because, to this extent, it has observed and followed both the letter and the policy of the law.[11] The statute obviously was not intended to prescribe two conflicting policies, one for application when the persons affected agree, the other to be applied when they disagree. So to construe it would turn the policy to be applied upon the factor of agreement alone, which of course only would invite disagreement.

But when the limit has been reached, and the employees cannot agree, some power must provide the decision as to the appropriate unit, unless the Act is to break down and its purposes be defeated. Those consequences cannot be avoided by leaving things forever as they have been set by the arrangements, contractual or otherwise, made in and for another day long gone. There must be some room for change and adjustment, but it need not be, and the law does not require it to be, in all cases a total disruption of existing arrangements.

Between these two extremes the statute has drawn a compromise and, in my opinion, the only workable one. This is, in effect, that the Board must decide, when a dispute concerning representation presents the issue, "who may participate in the election," that is, what is the appropriate or proper unit of which the sense is to be taken by the majority vote (or other means) the Act requires. That decision is not to be made arbitrarily, or uniformly in all cases without regard to the varying conditions presented. It is to be made in the light of various factors, as shown by the evidence presented to the Board, including the size of the carrier, the nature of the preëxisting or prevailing arrangements, the disruption of harmonious relations with the employer which the proposed change, or the failure to make it, might bring. Approached in this manner, the Board's decision might be for a carrier-wide craft or class or for one less extensive, depending upon the case made. Conceivably in some cases decision either way might be sustained. But at all events it is one which should be made by an exercise of the Board's judgment, not as an automatic reflection of a statutory requirement of carrier-wide crafts.

Enough has been said, I think, to show the fallacy as well as the dangers of accepting either of the two extreme views which have been put forward in this case. Because each seems to me to involve dangers as great as the other and like misconceptions of the statute's language and policy, I have been unable to accept the one or the other. In my opinion the Board, when it decided as a matter of law that the statute requires carrier-wide crafts as the voting unit, whenever the dispute raises that question, failed to exercise the judgment which the statute calls into play.

For this reason the judgment should be reversed and the cause remanded to the District Court, with instructions to vacate the Board's order.

---

[11] Cf., however, note 9, supra.